STATE OF VERMONT

ENVIRONMENTAL COURT

|  | } |  |
|---|---|---|
| In re: Cota Act 250 Land Use Permit (Altered) | } | Docket No. 114-6-07 Vtec |
|  | } |  |
|  | } |  |

Decision and Order

Appellant-Applicants Eric and Geraldine Cota appealed from certain conditions imposed in a decision of the District 6 Environmental Commission approving Act 250 Land Use Permit #6F0590(Altered) for an as-built garage.  Appellant-Applicants (the Cotas) are represented by Joseph F. Cahill, Jr., Esq.; Interested Persons Michaela and Michael Ledden (the Leddens) are represented by Pamela A. Moreau, Esq.  The Natural Resources Board did not enter an appearance in this appeal.

An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge.  A site visit was taken at the beginning of the hearing day, with the parties and their representatives.  The parties were given the opportunity to submit written memoranda and requests for findings, and extended the time for these filings by agreement.  Upon consideration of the evidence as illustrated by the site visit, and of the written memoranda and requests for findings filed by the parties, the Court finds and concludes as follows.

The Cotas own and occupy two parcels of property, each with frontage on the easterly side of Route 118.  A row of small, largely residential properties is located along the easterly side of Route 118 in this area, each of which is approximately 75 to 175 feet in width and approximately 150 feet in depth.  The Cotas own and occupy one of these small residential parcels, approximately ¾ of an acre in area, which they acquired in 1972.  The rear (easterly) lot lines of the row of small parcels adjoin a large (16.3-acre)

1

parcel formerly owned by Keegan, and acquired by the Cotas in 1988. That parcel consists of approximately five acres of field adjoining the rear lot lines of the row of small parcels, plus approximately 10.6 acres of woods beyond the field, plus one of the small parcels with frontage along Route 118, northerly of and separated from the Cotas' residential parcel by one other unrelated small residential parcel.

The Leddens own and occupy a small residential parcel southerly of and separated from the Cotas' residential parcel by one other unrelated small residential parcel. The Leddens' residential lot fronts on Route 118; its easterly (rear) lot line of 87.11 feet in length, and an adjoining 22-foot-long segment of its northerly lot line (sometimes referred to during trial as a "jog") adjoin the Cotas' 16.3-acre parcel.

A pole barn or large shed is located on the Cotas' 16.3-acre parcel, near the rear lot line of the next property to the north of the Leddens' residential property and just to the south of the Cotas' residential property. The open side of this pole barn faces easterly; from time to time a dump truck formerly was parked to the southeast of the pole barn close to the 22-foot-long segment of the Leddens' northerly side lot line. Conditions 17 and 18 of the Permit, which are not at issue in this appeal, now require that the pole barn be used for activity associated with the Cotas' nursery and greenhouse business; that the Permittee "shall prohibit the storage, processing, loading, sorting and sifting of any earth resources from behind the Ledden[s'] rear property line and southeast of the pole barn;" and that "[t]he land to the southeast of the pole barn shall be used for farming purposes as defined in [10 V.S.A.] § 6001(22)."

Although the row of small properties lining both sides of the road is village-like in character, and includes a bed-and-breakfast, a restaurant, an antiques shop open part-time, and a massage business, as well as residences, Route 118 is a through road and carries through traffic, including tractor-trailer and tandem-axle truck traffic. At least twenty to twenty five such trucks per day, and seasonally as many as fifty or sixty per day, pass in front of the Ledden and Cota residences on Route 118, some of which

apply their engine brakes to slow down when passing through the village area. However, the traffic noise is not so obtrusive or disturbing to the Leddens' back yard activities as is noise from the Cota 16.3-acre parcel.

After the Cotas acquired the 16.3-acre parcel, they began to use it as a storage area for the equipment used in Mr. Cota's excavation and landscaping business, and to stockpile materials for that business, which became Mr. Cota's full time occupation in the early 1990s. In addition, during the 1997 severe flooding in the Montgomery area, the Town of Montgomery stockpiled large quantities of road repair materials in the area of the Cota property behind and visible from the Leddens' back yard.

Mr. Cota operates an excavating and landscaping business from the property, and stores equipment and supplies (sand, gravel, topsoil, and crushed stone) used in the business on the 16.3-acre parcel. In the peak years of approximately 2000-2001, when the business had two employees as well as Mr. Cota, the business used a number of different pieces of heavy equipment to move material to, on, and from the property. Mr. Cota had the 40' x 62' metal garage at issue in this appeal constructed on a slab foundation on the 16.3-acre parcel in 2000, without then obtaining an Act 250 Permit. The garage is intended to provide an indoor space for the storage and servicing of the business equipment formerly stored in the open on the property. The Cotas subsequently applied for an as-built permit for the garage; certain conditions of that permit are the subject of this appeal.

The stockpiling activity involved deliveries to the property by tandem-axle dump trucks, including the dumping of material and the banging of the tailgate to dislodge sticky or soft earth material that did not slide out by gravity. It is possible to remove such remaining soft or sticky material by shovel, to avoid banging the tailgate. At the height of the business activity, as much as eight to ten tandem-axle dump truck loads a day were brought to the property and stockpiled there, with work going on during extended hours and on weekend days. The activity on the property during the

3

peak years impaired the Leddens' ability to fully enjoy their back yard. In particular it was the unpredictibility of the work times that was a problem for the Leddens, so that they could not count on any given day or time to be quiet.

Since July of 2003, however, Mr. Cota's health issues have resulted in a severely reduced level of operation of his business. Currently, Mr. Cota anticipates being able to work no more than one to three days in any week, during the approximately thirty-week operating season from mid-April through the first week in November.

In light of Mr. Cota's reduced schedule, he has disposed of much of the equipment. Specifically, the following equipment that was in use on the property during the height of its use has been disposed of: a tandem-axle dump truck with a 20-ton tag-along, an E110B Cat excavator, two grizzlies (stationary screening devices to separate finer material from larger stones that would roll down the outside of the screen), and a 3½-yard bucket loader used to feed material onto the grizzlies. Two other pieces of equipment were being offered for sale as of the date of trial: a dozer and a Traxcavator. The equipment remaining on the property for use in the business is a one-ton (non-tandem-axle) dump truck, a nine-ton tag-along, a small PC40 light blue excavator on rubber tracks, and a small red Kubota 4-wheel-drive tractor with several attachments.

In addition to disposing of equipment, the Cotas have disposed of or are in the process of disposing of a pile of steel girders, a large tank, and a pile of large concrete blocks. They are maintaining relatively reduced size piles of materials on the property compared to during the peak period. The southerly and westerly area of the field where the Town's materials had been stored has also been cleaned up and seeded; some of it is now used for agriculture and gardening. The Cotas eventually hope to sell the 16.3-acre property after it is fully cleaned up.

Unappealed Conditions 8 (daytime- and weekday-only hours of operation), 10 (vehicle servicing indoors), 18 (prohibiting earth resource material work behind the

4

Leddens' rear property line and southeast of the pole barn) and 20 (prohibiting rock crushing and screening), together with the fact that the operating season is April 15 through the first week in November, have reduced the potential for noise and visual effects that might disturb the Leddens in the use of their property, compared to the level of use at the height of operation of the business.

Mr. Cota estimates that, at the current reduced level of the business, the total number of tandem-axle dump truck loads of material that would be required to be delivered to the property in an entire annual thirty-week season is approximately thirty tandem-axle dump truck loads, but that he might require, for example, a delivery of up to four such loads in a single week, followed by, for example, no such deliveries for six weeks. However, now that the Cotas do not own a tandem-axle dump truck, the landscaping and stone materials delivered to the property must either be delivered by the gravel pit owner or by another supplier, both of whom use tandem-axle dump trucks. Otherwise, if the material had to be collected in the Cotas' one-ton dump truck, it would require four or five times as many truck loads, as the one-ton dump truck must make at least four or possibly five round trips to bring in the same amount of material that can be carried by a single tandem-axle dump truck. The Cotas' estimate of 30 truck trips of deliveries to the property in each operating season was based on the tandem-axle dump truck capacity.

The noise of a tandem-axle dump truck is a deeper (lower frequency) noise compared to that of a one-ton dump truck, and was experienced by the Leddens during the height of operation of the business as more obtrusive. However, no sound measurements or expert evidence was presented as to the decibel level of that noise or whether such noise is any louder (that is, at a greater decibel level) than that produced by a one-ton dump truck. The Court finds that a more limited number of tandem-axle truck deliveries to the property, if done with advance notice to the Leddens, will be less

5

obtrusive and disturbing to the Leddens' use of their back yard than four or five times the number of one-ton dump truck deliveries.

The District Commission granted the Act 250 Permit at issue in this appeal in April of 2007 and altered its decision on May 29, 2007.  The Cotas appealed Conditions 14, 15, 16, and 21, of the altered permit.

Condition 14 required that:

The Permittee shall install a six foot stockade fence[] along the Ledden[s'] rear property line (easterly) and 22' along the Ledden[s'] [northerly[1]] line. The Permittee shall submit  a site drawing depicting final location, fence type and fence color to the Commission and the Ledden[]s for review and approval within 60 days of the issuance of this permit.  The Permittee shall apply for and secure all necessary local permits within six months of the issuance of this permit and shall install the fence within one year of the issuance of this permit.  The Permittee shall be responsible for the maintenance of the fence.

The parties agreed on the record of the hearing that a six-foot-high stockade fence as provided in Condition 14 will be installed on the Ledden property line where it adjoins the Cota 16.3-acre parcel, and that the Leddens will allow access to their property so that the fence can be installed with the face side (so-called 'good' side) facing the Ledden property.  The Leddens agree to the design and appearance of the fence as shown on Exhibits 1 and 2, and that the face side of the fence need not be painted by the Cotas.

Condition 15 required that:

The Permittee shall plant a double row of pine trees (6'–8' in height), spaced 10' on center[,] behind the entire length of the fence on the Permittee property and shall be maintained by the Permittee.  Should the

---

[1]  The text says "southerly," but all parties agreed at trial that it was meant to refer to the segment of the Ledden's northerly lot line adjoining the Cotas property and running to the southeasterly corner of the next property to the north.

Ledden[]s and the Permittee reach some other mutually accepted solution, they shall contact the Commission for review and approval.

The purpose of the tree planting required by Condition 15 is to block or minimize the visual and aural impacts of the Cotas' excavating and landscaping business activities from the Leddens' deck and back yard, to the extent that those activities can be heard or seen above the proposed fence. Although pine trees provide a dense visual screen, a screen of pine trees is not appropriate in the location imposed by Condition 15, because that species will grow too large and will shade the Leddens' existing trees, shrubs and garden from the east; because the dropping of the pine needles will render the soil acidic and may adversely affect the health of the existing trees, shrubs and flower garden in the Leddens' back yard; and because tree limbs may fall in windy conditions and damage the fence and the Leddens' existing trees and shrubs. Cedars are also not an appropriate species as they are likely to be eaten by deer.

Mr. Cota suggested in evidence that balsam firs may be a better species to use, although there was no evidence as to the height at maturity of balsam firs. Although the purpose of the tree screening is to supplement the fence during the operating season of the Cota business (and the season during which the Leddens use their deck and back yard), no evidence was presented as to whether any deciduous tree species might be a more appropriate choice.

Several beautiful mature lilac trees are located at the easterly end of the Leddens' back yard which now provide the necessary screening above the fence during the season of operation of the Cota business. At present, it will provide sufficient screening to plant new trees for screening purposes only in the 35-foot-long area marked with three Xs on Joint Exhibit 3. Only if and when the Leddens' large lilac trees die or must be removed would it be necessary to add screening trees to replace them.

Condition 16 provided that: "[t]here shall be no more than one truck trip per week that delivers earth resource material to the landscaping and excavating business

7

in any year of operation."  Condition 21 provided that "[t]he use of tandem axle trucks for use in the excavating and landscaping business shall be prohibited."

To achieve the delivery of up to thirty tandem-axle loads of material in the thirty-week season as required for the Cota business, while protecting the Leddens' use of their deck and back yard,  Conditions 16 and 21, taken together, must be amended to allow deliveries by tandem-axle truck, but to limit the numbers of deliveries in any week and any operating season, and to provide advance notice to the Leddens.

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED as follows (new text shown in **bold** type, deleted material shown in ~~strike through~~ type):

Condition 14 is hereby amended as follows:

> The Permittee shall install a six-foot stockade fence along the Leddens' rear (easterly) property line and 22' along the Leddens' northerly line, **where the Leddens' property line abuts the Cota property. The Leddens agree to allow entry onto their property as necessary for the installation of the fence, during reasonable hours and upon reasonable advance notice.  As agreed by the Cotas and the Leddens, the fence shall be similar in design and appearance to Exhibits 1 and 2, and shall be installed unpainted and with the face side towards the Leddens' property.** ~~The Permittee shall submit  a site drawing depicting final location, fence type and fence color to the Commission and the Ledden[]s for review and approval within 60 days of the issuance of this permit.~~  The Permittee shall apply for and secure all necessary local permits **to construct the fence** within **three** ~~six~~ months of the issuance of this permit and shall install the fence within one year of the issuance of this permit.  The Permittee shall be responsible for the maintenance of the fence **to the extent that the fence can be reached from the Cota property, but the Permittee is not required to paint or otherwise maintain the face of the fence facing the Leddens' property.**

Condition 15 is hereby amended as follows:

> The Permittee shall plant a double row of **balsam fir** ~~pine~~ trees (6'–8' in height **at planting**), spaced 10' on center, behind the **portion** ~~entire length~~

8

of the fence on the Permittee property **installed under condition 14 above that is marked on Joint Exh. 3 with three X's, for a total of 35 feet in length**; ~~and~~ **the trees** shall be maintained by the Permittee. ~~Should the~~ **If and when the mature lilac trees near the Ledden rear property line die or are removed as diseased or unsafe, the Permittee shall plant additional balsam fir trees as above, along the remainder of the fence along the Ledden easterly property line, unless at that time either the** Leddens ~~and~~ **or** the Permittee, **or their successors,** ~~reach some other mutually accepted solution, they shall contact~~ **apply to** the Commission for **amendment of this condition** ~~review and approval~~.


Condition 16 is hereby amended as follows:

There shall be no more than **four truck trips** ~~one truck trip~~ **in any calendar** ~~per~~ week, **and shall be no more than a total of thirty such truck trips in any operating year (April 15 through the first week of November)** that deliver earth resource material to the **Permittee's** landscaping and excavating business ~~in any year of operation~~. **All such deliveries shall occur only during the permitted operating hours as provided in Condition 8. Other than under emergency conditions, twenty-four hours' prior notice shall be provided to the Leddens, by telephone or other method of their choice, of the schedule for such trips, and all trips for a given week shall be scheduled on a single day of that week. Banging of tailgates is prohibited; any soft or sticky material that does not slide out shall be removed by an alternative method.**

Condition 21 is hereby amended as follows:

The use of tandem-axle trucks ~~for use~~ in the excavating and landscaping business **on the property is** ~~shall be~~ prohibited **except for the truck trips allowed by Condition 16, which may be conducted by tandem-axle trucks.**


This decision concludes this appeal; it is remanded to the District 6 Environmental Commission only to the extent necessary for it to issue a further altered Land Use Permit #6F0590 to conform to the changes ordered in this decision. Any

requests for or agreements to further changes in the conditions of Land Use Permit #6F0590, as so altered, must be made to the District Commission in the first instance.

Done at Berlin, Vermont, this 14th day of January, 2009.


_____
             Merideth Wright
             Environmental Judge